UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

W.S., individually and on behalf of A.S.,
a minor,

        Plaintiff,

    -v-                                        No.  15 CV 3806-LTS

THE CITY SCHOOL DISTRICT OF THE
CITY OF NEW YORK, d/b/a THE NEW
YORK CITY DEPARTMENT OF
EDUCATION,

        Defendant.

-------------------------------------------------------x

## MEMORANDUM OPINION AND ORDER

       Plaintiff W.S., the mother of A.S., a child with autism, brought this case

individually and on behalf of A.S. under the Individuals with Disabilities Education Act, 20

U.S.C. §§ 1400 et seq. (the "IDEA"), as an appeal from an administrative determination finding

that Defendant, the New York City Department of Education (the "DOE"), provided A.S. with a

free and appropriate public education (a "FAPE") as required by the IDEA.  This Court has

jurisdiction of this action pursuant to 28 U.S.C. § 1331 and 20 U.S.C. § 1415(i)(2)(A).

       Plaintiff unilaterally placed A.S. in a private school during the 2011-2012 school

year and sought reimbursement of tuition.  At an administrative hearing, an Impartial Hearing

Officer ("IHO") found that the DOE had denied A.S. a free and appropriate public education (a

"FAPE") and ordered the DOE to reimburse Plaintiff.  The DOE petitioned for further review by

a State Review Officer ("SRO") of the New York State Education Department's Office of State

Review, and the SRO reversed the IHO's decision, finding that the DOE did provide A.S. with a

FAPE and denying reimbursement.  Plaintiff brought this case seeking review and reversal of the SRO's determination.

The parties have cross-moved for summary judgment.  Plaintiff seeks full reimbursement of the tuition paid during the 2011-2012 school year; Defendant seeks dismissal of the complaint.  The Court has reviewed thoroughly all of the parties' submissions, including the administrative record, and for the reasons set forth below, Plaintiff's motion for summary judgment is granted and Defendant's cross-motion is denied.

BACKGROUND

The IDEA's Statutory Framework

The IDEA requires all states receiving federal funds "to provide 'all children with disabilities' a 'free appropriate public education.'"  Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 107 (2d Cir. 2007) (quoting IDEA, 20 U.S.C. § 1400(d)(1)(A)).  The parties do not dispute that A.S., who has been diagnosed with autism, is a child with a disability.  For each child with a disability, like A.S., the appropriate state or local educational agency must develop an "individualized education program" ("IEP") for the child.  20 U.S.C. § 1414(d).  In New York, IEPs are developed by local "Committees on Special Education" ("CSEs") in conjunction with the parents of the disabled student.  N.Y. Educ. L. § 4402(1)(b)(1).

Parents have a right under the IDEA to present a complaint regarding the identification, evaluation, or placement of their child through the IEP process.  20 U.S.C. § 1415(b)(6)(A).  Parents who disagree with the IEP developed by the CSE may unilaterally place their child in a private school, at their own risk, and then seek a retroactive reimbursement of the private school's tuition from the local school district.  Id. § 1412(a)(10)(C).  In order to

obtain reimbursement, parents have a right under the IDEA to an "impartial due process hearing" before an IHO.  Id. § 1415(f)(1)(A); N.Y. Educ. L. § 4404(1)(a).  The decision of the IHO may be appealed by either party to an SRO, who conducts an independent review of the factual findings and decision of the IHO.  20 U.S.C. § 1415(g); N.Y. Educ. L. § 4404(2).  Either party may then challenge the SRO's decision in federal district court, which is empowered by the IDEA to "receive the records of the administrative proceedings," to "hear additional evidence," and to "grant such relief as the court determines is appropriate" based on "the preponderance of the evidence" presented.  20 U.S.C. § 1415(i)(2)(C); see also N.Y. Educ. L. § 4404(3); Forest Grove Sch. Dist. v. T.A., 557 U.S. 230 (2009) (holding that the power of a reviewing district court includes the authority to grant reimbursement, when appropriate).

The Factual Record

The following summary of facts is drawn from the administrative record, which was submitted to the Court in connection with the instant motion practice.  A.S. was a seven-year-old girl when the 2011-2012 school year began.  (IHO Dec. at 7.[1])  A.S. was classified as a student with autism by her CSE, a classification that is not disputed by the parties.  (Tr. 15-16.[2])

Development and Education Prior to the 2011-12 School Year

A.S. was not reaching developmental milestones at six months of age, and was referred for speech, occupational, and physical therapy.  (Tr. 1038.)  A.S. was diagnosed with

---

[1]     Citations to "IHO Dec." refer to the March 12, 2013, administrative decision of Impartial Hearing Officer Lana S. Flame, Esq.

[2]     Citations to "Tr." refer to the transcript of the IHO hearings conducted on July 17, 2012; September 12-13, 2012; September 24, 2012; October 11, 2012; October 22-23, 2012; October 23, 2012; October 25, 2012; December 5, 2012; December 13, 2012; December 17, 2012; and December 26, 2012.

Pervasive Developmental Disorder ("PDD") at age two, and was shortly thereafter recommended for 10 hours per week of at-home Applied Behavior Analysis ("ABA") therapy.  (Tr. 1038.)  In June 2006, at roughly two and a half years of age, A.S. began attending a center-based ABA program for Early Intervention at Personal Touch, which provided one-to-one ("1:1") instruction, in addition to continuing with therapy at home.[3]  (Tr. 1039.)

In August 2007, A.S. aged out of Early Intervention.  She began attending preschool in September 2007.  Her preschool (then called Marcus Avenue School, and later renamed Brookville Children's Center) provided physical, occupational, and speech therapy in a classroom with six children, one lead teacher, and two paraprofessionals (a "6:1:2 " classroom).  (Tr. 1039-40.)  In addition, A.S. received 10-15 hours per week of 1:1 ABA therapy.  (Tr. 1039.)

After her first year of receiving 6:1:2 instruction at Marcus Avenue, A.S. was evaluated at the McCarton Center because her parents felt that she was not progressing as well as she had been when receiving 1:1 instruction at Personal Touch.  (Tr. 1041.)  A.S. underwent psychological, speech, language, and occupational therapy evaluations at McCarton.  (Tr. 1041.)  McCarton's conclusion from the results of those evaluations was that A.S. required 1:1 ABA therapy, and that her 6:1:2 placement at Marcus Avenue was not appropriate.  (Tr. 1041.)

A.S. left Marcus Avenue in August 2009.  (Tr. 1039.)  Starting in September 2009, A.S. began attending the Brooklyn Autism Center ("BAC"), which provides 1:1 ABA

_____

[3]      The decision of the IHO states that the center-based ABA program A.S. began attending in June 2006 had a ratio of six children to one teacher and two paraprofessionals ("6:1:2 ").  (IHO Dec. at 9.)  This conclusion misstates the testimony at the hearing that the IHO cited in support of this statement.  At the hearing, W.S. testified that the program A.S. began in June 2006  (Personal Touch) "was a one-to-one ABA program that used discre[te] trial instruction."  (Tr. 1039.)  W.S. then testified that the preschool A.S. attended after aging out of the 1:1 program (Marcus Avenue School) "was a 6:1:2 classroom."  (Tr. 1040.)

therapy.  (Tr. 1039-40.)  In 2010, A.S. was evaluated a second time by outside doctors, who

confirmed the McCarton Center's conclusion that A.S. required 1:1 instruction.  (Tr. 1041-42.)

Progress Reports in Advance of the 2011-2012 School Year

BAC prepared a "Treatment Summary" for A.S. in March 2011, which contained

goals and objectives for the 2011-12 school year.  The Summary states that A.S. "is learning to

walk quietly, appropriately stand still, and wait for tangibles when instructed."  (IHO Dec. at 11;

see also IHO Ex. 7.)  The Summary further states that A.S. is learning "to follow two-step

instructions . . . answer yes or no questions . . . [and] imitate simple sounds and words through

vocal imitation."  (IHO Dec. at 11.)  The Summary concluded that A.S. required 1:1 ABA

structured teaching.  (IHO Dec. at 12.)

In March 2011, an occupational therapist wrote a progress report for A.S. that

noted that A.S. received 1:1 occupational therapy three times per week for 30 minutes at

Emilia's Kids Center for Pediatric Therapy.  (IHO Ex. 3.)  This report states that A.S. "continues

to present with deficits in the areas of sensory processing skills (attention, motor planning, safety

awareness and body awareness), upper body strength, fine motor skills, visual-motor integration,

and self-care skills."  (IHO Ex. 3, at 1.)  The report recommended an increase in 1:1

occupational therapy from 30 minutes to 45 minutes three times per week for A.S. because of

her sensory processing deficits.  (IHO Ex. 3, at 3.)

Also in March 2011, a speech therapist wrote a progress report for A.S. that noted

that A.S. received 1:1 speech and language therapy five times per week for 30 minutes, also at

Emilia's Kids.  (IHO Ex. 6.)  The report noted significant "interfering behaviors" by A.S., and

stated that her "performance on language tasks remained highly dependent on her degree of

attention and focus."  (IHO Ex. 6.)  According to the report, A.S. "demonstrated an

understanding and ability to follow simple and routine one to two-step directions, answered yes/no questions, stated her name, and was learning to respond when asked her age." (IHO Dec. at 13.) The report noted that A.S. had poor speech intelligibility and that her expressive language was generally limited to one- or two-word utterances. (IHO Dec. at 14.) The report also noted that A.S. "required constant supervision during meal and snack times" because "she over-filled her mouth with food" and "often swallows whole pieces of food without chewing," requiring "frequent verbal cueing during mealtimes." (IHO Dec. at 14; IHO Ex. 6, at 3.) The report recommended that A.S. continue receiving 1:1 individual speech therapy five times per week for 30 minutes. (IHO Ex. 6, at 4.)

Finally, also in March 2011, a physical therapist wrote a progress report noting that A.S. was receiving 1:1 physical therapy three times per week for 30 minutes, also at Emilia's Kids. (IHO Dec. at 15.) The report listed as concerns that A.S. had "poor motor planning; impaired movement pattern; poor sensory processing and integration; low muscle tone; weakness of both lower extremities['] muscle strength; impaired balance; poor posture control; poor coordination; poor protective reactions (during falling); and, low endurance." (IHO Dec. at 15; see also IHO Ex. 4, at 1.) The report recommended an increase of 1:1 physical therapy services to five times per week for 30 minutes. (IHO Ex. 4, at 4.)

The 2011-12 School Year IEP

The CSE met to develop an IEP for A.S. on March 25, 2011. (IHO Dec. at 15.) The CSE was comprised of W.S.; Jamie Nicklas, from BAC; Elsie Grandoit, a psychologist from the DOE; Lydia Nesbit, a special education instructor; and a parent member. (Tr. 1042.) The IEP section for Present Academic Performance and Learning Characteristics stated that A.S. was focusing on functional, not academic, skills, such as walking quietly, standing still, waiting

appropriately, and sitting appropriately.  (IHO Ex. 1, at 3.)  The IEP noted a teacher report that A.S. had difficulty attending visually and attending to verbal cues, and that A.S. engaged in "self stimulatory behaviors" that "interfere with her ability to learn."  (Id., at 3.)

The IEP section for Social/Emotional performance states that A.S. "often initiates contact with peers in an inappropriate manner," has poor attention span, and engages in repetitive self-stimulatory behavior.  (Id., at 4.)  The IEP states that A.S. requires a full-time behavior management paraprofessional and a behavior management plan.  (Id., at 4.)

The CSE recommended that A.S. attend a 6:1:1 class in a specialized school with the services of a 1:1 behavior management paraprofessional.  (IHO Dec. at 17.)  The CSE also recommended that A.S. receive 1:1 speech therapy five times per week, 30 minutes per session; 1:1 physical therapy five times per week, 30 minutes per session; and 1:1 occupational therapy three times per week, 45 minutes per session.  (Id.)

In April 2011, W.S. signed a contract with BAC to secure a placement for A.S. in the 2011-12 academic year, paying a $1,000 deposit by check.  (Id.)  W.S. testified that she paid the deposit because she had not yet received a placement offer for A.S. from the DOE and did not want A.S. to lose her place at BAC.  (Tr. 1056-57.)  The contract provided that W.S. had until September 10, 2011 to notify BAC in writing if A.S. would be enrolled in the placement offered by the DOE.  (IHO Ex. TT.; Tr. 1057.)

On June 1, 2011, W.S. paid $31,500 towards the total $95,000 BAC tuition for the 2011-12 academic year.  (IHO Ex. E, at 2.)  W.S. later paid the remaining balance.  (IHO Ex. E.)

On June 17, 2011, W.S. received a Final Notice of Recommendation ("FNR") from the DOE, dated June 14, 2011.  (IHO Ex. 8.)  The FNR memorialized the determinations of

the CSE and provided a placement for A.S. at P004Q @ P213.  (Id.)  By letter dated June 17,

2011, W.S. (through an attorney) provided notice of her intent to place A.S. at the BAC and

provide her with related services during the 2011-12 academic year.  (IHO Ex. B, at 1.)  The

letter alleges that the FNR denied A.S. a FAPE.  (IHO Ex. B, at 2.)

      Despite sending this letter, W.S. contacted P004Q to arrange a site visit on June

20, 2011, and scheduled a visit for June 22.  (Tr. 1047-1048.)  W.S. visited P004Q with Nicklas,

from BAC, and they were given a tour by a school employee, Nancy Buscella.  (Tr. 1050.)

Buscella did not have an IEP for A.S., and asked W.S. about her daughter.  (Tr. 1052.)  W.S.

testified that Buscella appeared familiar with children like A.S.  (Tr. 1051.)

      During the tour, W.S. was told that A.S. would likely be in a class of students six

to eight years of age.  (Tr. 1052.)  W.S. observed a picture schedule in a classroom she was

shown on the tour, which included social studies, science, and math, along with activities of

daily living (referred to as "ADL") and discrete trial periods.  (Tr. 1051-52.)  W.S. asked about

how the academic subjects would be taught, and did not receive an answer.  (IHO Dec. at 18; Tr.

1053-54.)  W.S. also observed a speech therapy area, which was part of a larger classroom, and

believed the room would have been too noisy for A.S. to focus appropriately.  (Tr. 1053-54.)

      W.S. wrote to the DOE on June 24, 2011, and rejected the DOE's placement

offer.  (Ex. C.)  W.S. noted several problems with the proposed placement.  P004Q did not offer

1:1 ABA therapy, which W.S. believed A.S. required; rather, P004Q would provide some

discrete trial instruction along with group lessons in academic and behavioral subjects.  (IHO Ex.

C, at 1.)  W.S. also noted that paraprofessionals at P004Q were not required to attend training in

discrete trial instruction, though training was offered.  (Id.)  W.S. also wrote that A.S. did not

have the skills necessary to participate in academic group lessons, such as those in social

science, math, and reading.  (Id. at 2.)  W.S. noted two concerns with noise: in the school's

cafeteria as well as in the speech therapy areas.  (Id.)  W.S. requested another IEP meeting and

another placement recommendation for A.S.  (Id.)  W.S. did not receive a response to this letter.

(Tr. 1055-56.)

       A.S. began attending BAC in July 2011 and attended BAC for the entire 2011-12

school year.  The DOE sent an IEP for A.S. on July 15, 2011, which W.S. received on July 16.

(Tr. 1047.)  On June 6, 2012, W.S. filed for an impartial hearing, and amended the request on

July 17, 2012.  (IHO Ex. A.)

Proceedings Before the IHO

       Defendants' principal witness before the IHO was Elsie Grandoit, who

participated in the CSE for A.S. as the District's representative and school psychologist.  (IHO

Dec. at 19.)  Grandoit testified that she created the IEP after reviewing the BAC progress report

and the occupational, physical, and speech therapy progress reports described above, along with

a BAC treatment summary.  (IHO Dec. at 19.)  Grandoit also reviewed prior IEPs for A.S. and

other documents created during the 2008-09 school year.  (Id.)  Grandoit had not evaluated, met,

or observed A.S. prior to creating the IEP.  (Id. at 24.)

       Grandoit said she relied on input from W.S. and Nicklas for the content of the

IEP.  (Tr. 38-39.)  Grandoit testified that Nicklas told the CSE that A.S. was not working on

academics, but was focusing on skills, and had difficulty attending.  (IHO Dec. at 20.)  Grandoit

also understood that A.S. had difficulties with language, gross and fine motor functioning,

socialization, and self-care.  (Id.)  Grandoit testified that the CSE viewed A.S. as having "severe

difficulties with her attention" and demonstrating the "classic type of traits of severely autistic

children."  (Tr. 33-34.)

Grandoit also testified that the IEP contained goal areas drawn from the BAC reports and Nicklas' impression of A.S.  (Tr. 78-93.)  The IEP contained entirely pre-academic goals for A.S.; no goals were listed in academic content areas.  (IHO Ex. 1, at 7.)  The IEP did not state particular levels of achievement for A.S., nor did it contain baselines.  (IHO Dec. at 21-22.)  Grandoit testified that she did not know why there were no levels of achievement listed, but said that there were no baselines because the CSE viewed A.S. as "learning" to perform the goals listed.  (Tr. 154-56.)

Grandoit testified that the CSE recommended a 6:1:1 classroom for A.S., in a specialized school.  (IHO Dec. at 22.)  She testified that the classroom was the DOE's "go-to in terms of autism" and has "familiarity" with autism.  (Tr. 67-68.)  Grandoit understood that teachers would understand each child's needs and that paraprofessionals would work in collaboration with the teacher.  (IHO Dec. at 23.)  However, Grandoit based her understanding solely on professional development she attended, not on firsthand knowledge of the school or its teachers.  (Id.)

Grandoit testified that the CSE concluded that a 6:1:1 classroom was appropriate for A.S. because she would have opportunities for "modeling" and "generalization" of the skills she was learning alongside students with more or less severe disability.  (IHO Dec. at 24.)  Grandoit described the parent's opposition to the CSE as being centered on the belief that A.S. would regress without 1:1 instruction.  (Id. at 25.)  Although W.S. requested a placement at BAC during the CSE, Grandoit testified that BAC was not an approved school and therefore could not be a recommended placement.  (Id.; Tr. 145-47.)

Caroling Barry, who would have taught A.S. had she attended the 6:1:1 classroom at P004Q, also testified before the IHO.  (Tr. 266-68.)  Barry described her students as being at a

pre-kindergarten level in reading and math.  (Tr. 214, 314.)  All of Barry's students received physical, speech, and language therapy at the school; some additionally required occupational therapy.  (Tr. 215-17, 292-93.)

Barry testified about the daily classroom activities A.S. would have had at P004Q.  (Tr. 244-45.)  In addition to discrete trial work, the class had three academic periods (reading, math, and social studies), a movement or art period, a lunch period, and an unspecified eighth class period each day.  (Tr. 271.)  The children would work with Barry and/or a paraprofessional during these periods, sometimes in a group setting.  (Tr. 245-50.)  Barry testified that she believed she would have been able to address the needs of A.S. as described in the IEP.  (Tr. 257.)

On March 12, 2013, the IHO issued her 50-page Findings of Fact and Decision. The decision began by addressing several claimed procedural violations.  First, the IHO found that the DOE's failure to provide W.S. with a copy of the IEP prior to the start of the school year was a procedural violation that prevented W.S. from meaningfully evaluating the DOE's recommendation.  (IHO Dec. at 38.)  The IHO found that this procedural failure alone resulted in the denial of a FAPE for A.S.  (Id.)  The IHO next found that W.S. was not denied meaningful participation in the CSE.  The IHO did not find sufficient evidence to establish that the CSE had a predetermined outcome with respect to A.S., or that the recommendation of a 6:1:1 program was policy-driven.  (Id. at 38-39.)  Third, the IHO found that the IEP was procedurally deficient because it did not specify "a baseline, measurement procedures, evaluation criteria and an evaluation schedule" for each of the objectives set out for A.S.  (Id. at 41.)  Finally, the IHO considered and dismissed the claim that the IEP was procedurally deficient because of a failure to provide counseling.  (Id.)

The IHO then discussed the parent's claim that the IEP was substantively deficient under the IDEA.  The IHO concluded that "the DOE provided no evidence that the student could make progress under the proposed IEP, through Ms. Grandoit's testimony or otherwise."  (IHO Dec. at 42.)  The IHO found no evidence that A.S. was capable of learning in a 6:1:1 classroom and substantial evidence that A.S. required 1:1 ABA instruction throughout the day and had previously regressed in a 6:1:2 setting (i.e., at Marcus Avenue).  (Id. at 43.)

Having concluded that the DOE failed to provide A.S. with a FAPE for the 2011-12 school year, the IHO then considered whether the unilateral placement of A.S. at BAC and Emilia's Kids  was appropriate.  The IHO concluded that BAC "provided the student with an appropriate education" and placement at BAC by the parents "was reasonably calculated to provide the student with educational benefit for the 2011-2012 school year."  (IHO Dec. at 45.)  The IHO also concluded that the related services provided by Emilia's Kids were appropriate and reasonable during the school year.  (Id. at 48-49.)

Finally, the IHO evaluated the equitable considerations relevant to a reimbursement award.  The IHO found that the parents had "actively participated" in the CSE and had cooperated and assisted the DOE in its preparation of the IEP for A.S.  (IHO Dec. at 49-50.)  The IHO therefore concluded that the parents had demonstrated an equitable basis for requesting reimbursement, and granted full reimbursement of the tuition for A.S. at BAC and Emilia's Kids.  (Id. at 50.)

Proceedings Before the SRO

The City appealed the decision of the IHO to the SRO, which reversed the IHO's decision in a 15-page opinion dated January 15, 2015 (the "SRO Dec.").  After reviewing the facts and procedural history, the SRO first turned to the parents' allegations of procedural

violations in the IEP.  The SRO found that the parents were able to formulate specific

disagreements with the DOE's recommendation despite not having received a copy of the IEP,

and were generally aware of what the IEP would recommend.  (SRO Dec. at 10.)  The SRO

therefore concluded that the parents were able to meaningfully evaluate the DOE's

recommendation and that the late provision of the IEP was not a procedural violation.  (Id. at

11.)  The SRO further concluded that the goals and evaluative criteria specified in the IEP were

sufficient under the applicable federal regulations, and were also not a procedural violation.  (Id.

at 11-12.)

        Turning to the alleged substantive violation, the SRO credited Grandoit's

testimony as establishing that a 6:1:1 classroom was appropriate to the needs of autistic students

and generally provided benefits to those students.  (SRO Dec. at 14.)  The SRO did not

specifically discuss how the 6:1:1 classroom would benefit A.S., nor did the SRO address the

impact of her prior regression in a 6:1:2 setting.  The SRO did note the parents' concerns about

the effectiveness of the recommended program, but concluded that the 6:1:1 classroom "was

reasonably calculated to enable the student to receive educational benefits."  (Id. at 15.)  The

SRO therefore reversed the IHO's decision, found that the DOE had provided a FAPE, and

denied the parents' request for reimbursement.

        W.S., on behalf of A.S., brought this case to appeal the decision of the SRO.

W.S. asserts that A.S. was denied a FAPE in violation of the IDEA.  Both parties now move for

summary judgment: W.S. seeks reimbursement of the tuition for BAC and Emilia's Kids during

the 2011-12 school year; the DOE seeks dismissal of the Complaint.

<u>DISCUSSION</u>

The stated purpose of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education." 20 U.S.C. § 1400(d)(1)(A) (LexisNexis 2006). To achieve this goal, the Second Circuit has held that "States have an affirmative obligation to provide a basic floor of opportunity for all children with disabilities," which includes "an education 'likely to produce progress, not regression,' and one that 'affords the student with an opportunity greater than mere trivial advancement.'" <u>T.K. v. N.Y.C. Dep't of Educ.</u>, 810 F.3d 869, 875 (2d Cir. 2016) (quoting <u>M.O. v. N.Y.C. Dep't of Educ.</u>, 793 F.3d 236, 239 (2d Cir. 2015) (internal modifications omitted)).

The "centerpiece" of the IDEA is the IEP. <u>Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.</u>, 297 F.3d 195, 197 (2d Cir. 2002). In order to ensure that a child receives a FAPE, the IEP "must include the child's present level of performance, goals for her improvement, and a plan about how to achieve that improvement." <u>T.K.</u>, 810 F.3d at 875. Further, it must "be reasonably calculated to enable the child to receive educational benefits." <u>Frank G. v. Bd. of Educ. of Hyde Park</u>, 459 F.3d 356, 363 (2d Cir. 2006) (internal quotation marks omitted).

If an IEP is procedurally or substantively deficient, parents may unilaterally reject the IEP's recommended placement in favor of sending their child to a private school and thereafter seeking reimbursement of tuition from the State. <u>T.K.</u>, 810 F.3d at 875. An IEP may be procedurally deficient such that a FAPE was denied "only if the procedural inadequacies (I) impeded the child's right to a [FAPE]; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a [FAPE] to the parents' child; or (III) caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii) (LexisNexis 2006). An IEP is substantively deficient if it fails to meet the requirements of the

IDEA by providing a FAPE.  See T.K., 810 F.3d at 875.

   Even if procedural or substantive deficiencies exist, reimbursement is appropriate only when "the parents' private placement is appropriate to the child's needs and to the equities" of each particular case.  T.K., 810 F.3d at 875 (quoting C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ., 746 F.3d 68, 77 (2d Cir. 2014) (internal modifications omitted)).  In New York, the DOE bears the burden of establishing the validity of the IEP; the parents bear the burden of establishing that the unilateral private placement was appropriate.  T.K., 810 F.3d at 875; see also N.Y. Educ. Law § 4404(1)(c).

   It is well established that "the role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed."  Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 112 (2d Cir. 2007) (internal quotation marks omitted).  A court reviewing the decisions of an IHO and SRO "must engage in an independent review of the administrative record and make a determination based on a 'preponderance of the evidence.'"  Id. (citation omitted).  This review, however, "is by no means an invitation to courts to substitute their own notions of sound educational policy for those of the school authorities they review."  R.C. ex rel. M.C. v. Byram Hills Sch. Dist., 906 F. Supp. 2d 256, 267 (S.D.N.Y. 2012) (citation omitted).  "[D]eterminations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures."  M.H. v. N.Y.C. Dep't of Educ., 685 F.3d 217, 244 (2d Cir. 2012).  Additionally, "the district court should afford more deference when its review is based entirely on the same evidence as that before the SRO than when the district court has before it additional evidence that was not considered by the state agency."  Id.

   The district court need not, however, defer to a determination that is not

"grounded in thorough and logical reasoning," and its review should involve "the kinds of considerations that normally determine whether any particular judgment is persuasive, for example whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." Id.

As discussed above, parents challenging the adequacy of an IEP may unilaterally place their child in a private school and seek retroactive tuition reimbursement from the local school district.  20 U.S.C. § 1412(a)(10)(C).  Under the three-part Burlington/Carter test,[4] parents are entitled to reimbursement if: (1) the district's proposed placement violated the IDEA, (2) the parents' alternative private placement was appropriate, and (3) the equities favor reimbursement.  See T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist., 752 F.3d 145, 152 (2d Cir. 2014).

Under the first prong of the Burlington/Carter test, there is a "two-part inquiry" for reviewing administrative determinations as to the provision of a FAPE.  R.C. ex rel. M.C., 906 F. Supp. 2d at 267-68.  First, the reviewing court determines whether "the State complied with the procedures set forth" by the IDEA; second, the court determines whether the IEP "developed through the Act's procedures [is] reasonably calculated to enable the child to receive educational benefits."  Id.  As to the second prong, the same standard generally applies in determining whether a school district's placement is appropriate as applies in determining whether a private placement is appropriate.  See Frank G., 459 F.3d at 364.

---

[4]     Florence Cnty. Sch. Dist. Four v. Carter, 510 U.S. 7 (1993); Sch. Comm. of the Town of Burlington v. Dep't of Educ., 471 U.S. 359 (1985).

Adequacy of the IEP

To fulfill the requirements of federal law, an IEP must be "likely to produce progress, not regression," and must afford the student "an opportunity greater than mere trivial advancement." T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 254 (2d Cir. 2009). Having reviewed the administrative record, and for substantially the reasons set forth in the well-documented and well-reasoned opinion of the IHO, the Court concludes that the IEP for A.S. in the 2011-12 school year does not meet that standard.

The IHO's Decision demonstrated an attentive and analytical approach to the record, and deserves deference for that reason and because the IHO was the administrative officer closest to the actual testimony of the witnesses in this case. By contrast, the opinion of the SRO consisted largely of a summary of evidence followed by a conclusory statement that the evidence "supports a finding that . . . [the IEP] was reasonably calculated to enable the student to achieve educational benefits." (SRO Dec. at 15.) A review of the administrative record finds, as the IHO concluded, no support for the DOE's position that a 6:1:1 classroom was reasonably calculated to provide A.S. with an opportunity for more than trivial advancement.

First, the DOE provided no evidence that A.S. was capable of making educational progress in a 6:1:1 environment. Rather, the DOE argues that, because the 6:1:1 program is generally appropriate for students with autism (the "go-to" program, in the words of Grandoit), it is appropriate for A.S. This does not satisfy the IDEA's mandate of an *individualized* educational program tailored to the specific needs of each student. There is a wealth of evidence submitted by the parent, both documentary and testimonial, that A.S. regressed in a prior 6:1:2 classroom and that A.S. requires 1:1 instruction in order to make meaningful progress. The DOE's conclusory and general statements that other autistic students are capable of making

progress in a 6:1:1 classroom cannot overcome this specific evidence of how A.S. responds to that classroom environment.

Second, the placement offered by the DOE did not bear a reasonable relation to the needs of A.S. that were stated in the IEP. The IEP was developed by Grandoit, who had no firsthand knowledge of A.S. By her own admission, Grandoit relied upon the reports provided by BAC and Emilia's Kids, as well as additional information provided by the parent and Nicklas, in formulating the IEP and recommended placement. Notably, not one of those sources of information about A.S. recommended placement in a 6:1:1 program; rather, they universally emphasized that 1:1 instruction was the only model that would give A.S. a chance of making progress. Further, the IEP recognized that A.S. was pre-academic, yet the DOE's placement would have placed A.S. in a classroom where a full third of each day (three periods out of eight, per Barry's testimony) would have been spent on academic subjects. Nowhere does the DOE explain how placement in this program would be appropriate for A.S.

Finally, the DOE did not proffer any evidence explaining why the 1:1 ABA therapy recommended by the BAC reports and by those who had actually interacted with A.S. was not necessary for A.S. to make progress. The IEP makes no provision for ABA therapy or 1:1 instruction of any kind. The substantial weight of the record evidence before the IHO supports the IHO's conclusion that the IEP did not provide a FAPE where it did not address the well-documented need for A.S. to receive 1:1 ABA therapy in order to make progress. See M.H. v. N.Y.C. Dep't of Ed., 685 F.3d 217, 252 (2d Cir. 2012) ("Although courts should generally defer to the state administrative hearing officers concerning matters of methodology, the SRO's failure to consider any of the evidence regarding the ABA methodology and its propriety . . . is more than an error in the analysis of proper educational methodology. It is a failure to consider

highly significant evidence in the record. This is precisely the type of determination to which courts need not defer, particularly when the evidence has been carefully considered and found persuasive by an IHO.")

In sum, the IHO's well-reasoned determination that the proposed placement denied A.S. a FAPE must stand, in light of the substantive violations described above as well as the procedural violations identified in the IHO's reasoned opinion, and summary judgment for the Plaintiffs is granted on this issue.

Entitlement to Reimbursement

If a student's IEP does not satisfy the requirements of the IDEA, parents are entitled to reimbursement for the costs of an alternative, unilateral private placement if that private placement was appropriate. The parents bear the burden of demonstrating the appropriateness of their unilateral private placement. Gagliardo, 489 F.3d at 112.

The parents have provided significant evidence that BAC was an appropriate placement for A.S. The uncontroverted record evidence from those who have actually interacted with and evaluated A.S., over many years, was that she required 1:1 ABA instruction. The DOE proffers no evidence to the contrary, aside from generalized arguments based on the testimony of individuals like Grandoit who have never met A.S., let alone evaluated her in an instructional or therapeutic setting. As the IHO determined based on the record before her, the totality of the evidence indicates that BAC and the related services A.S. received represented an appropriate unilateral placement for A.S. during the 2011-12 school year.

Considerations of equity support the conclusion that reimbursement is appropriate. W.S. participated actively in the CSE process and provided helpful and relevant information during that process, according to the DOE's own witness. There is no evidence to

suggest that W.S. impeded the CSE or IEP processes or acted to prevent the DOE from providing A.S. with a FAPE during the 2011-12 school year.

CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is granted and Defendant's cross-motion for summary judgment is denied.  This Memorandum Opinion and Order resolves docket entry nos. 7 and 13.  The Clerk of Court is respectfully requested to enter judgment in favor of Plaintiff and to close this case.

SO ORDERED.

Dated: New York, New York
       May 23, 2016

 /s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge